UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO.: 2:18-CR-126-JTM-JPK |
| ) | |
| ROY MCCARLIN BEASLEY, ) | |
|     Defendant. ) | |

**FINDINGS, REPORT, AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE PURSUANT TO
28 U.S.C. § 636(b)(1)(B) & (C)**

Defendant Roy McCarlin Beasley's Motion to Suppress [DE 15] is before the Court and fully briefed. Beasley frames the question as whether law enforcement "had reasonable suspicion criminal activity was afoot in order to remove [him] from his automobile and thereafter conduct a pat down search." (Def.'s Rep. 1, ECF No. 24).

On May 13, 2019, District Court Judge James T. Moody entered an Order referring this matter to the undersigned Magistrate Judge for a report and recommendation on the motion to suppress pursuant to 28 U.S.C. § 636(b)(1)(B). This Report constitutes the undersigned's combined proposed findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). For the reasons discussed below, the undersigned recommends that the motion to suppress be denied.

Specifically, the undersigned recommends that the District Court find no violation of Beasley's Fourth Amendment rights. Beasley's argument that his rights were violated when he was ordered out of his car following a valid traffic stop runs contrary to caselaw. His argument regarding the subsequent pat down turns on facts brought forth at a hearing on the motion to suppress. A careful review of those facts and the totality of the circumstances leading to the pat down show that law enforcement's suspicion that Beasley was concealing a firearm was objectively reasonable and does not call for suppression of evidence.

## PROCEDURAL BACKGROUND

On August 2, 2018, the State of Indiana filed a four-count complaint charging Beasley with three felony counts, including unlawful possession of a firearm by a serious violent felon, and one infraction count. Attached to that criminal complaint was a probable cause affidavit sworn to by Lake County Sheriff's Department Detective Alfonso Randle. On November 9, 2018, Beasley filed a motion to suppress. On November 27, 2018, the State of Indiana filed a motion to dismiss.

On November 14, 2018, Beasley was charged in this Court by way of a single count federal indictment charging him with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Beasley was arrested on this federal charge and had his initial appearance on March 6, 2019. On April 17, 2019, Beasley filed the instant Motion to Suppress, a supporting memorandum, and Detective Randle's probable cause affidavit. The government filed a response on April 30, 2019. Beasley filed a reply on May 3, 2019. The Court held a hearing on the motion on June 5, 2019. The government filed a supplemental brief on June 7, 2019. Beasley did not file a supplemental brief, and the deadline by which to do so has passed.

## FACTUAL BACKGROUND

According to the probable cause affidavit from Beasley's state charges, on July 31, 2018, at approximately 11:40 p.m. in Gary, Indiana, Detective Randle "clocked" a vehicle traveling 67 miles per hour in a zone marked with a maximum speed of 40 miles per hour. Detective Randle conducted a traffic stop of the vehicle and identified the driver as Beasley by his driver's license. Detective Randle "observed [Beasley's] body movements to be abnormal, as he kept his left hand on his left front pants pocket, while using his right hand to pass his license and vehicle information across his body." (Probable Cause Aff. 1, ECF No. 17). Two additional detectives, Detectives Anderson and Fertig, arrived to assist, and Detective Randle asked Beasley to exit the vehicle.

Detective Randle asked Beasley if there were any weapons or narcotics inside the vehicle and received a negative answer. Detective Anderson then performed an outer clothing pat search and discovered a handgun in Beasley's front waistband.

Detective Randle testified at the June 5, 2019 hearing on this matter, further developing the factual record. Detective Randle's demeanor during the hearing suggests he was doing his best to recount the facts as accurately as he could remember them. Though Beasley's counsel conducted effective cross-examination and even obtained a concession, which, read out of context, could call into question Detective Randle's truthfulness, the Court finds Detective Randle credible.

Detective Randle has significant law enforcement experience, having spent seven years as a police officer and six more years working for the Lake County, Indiana jail. More recently, in January of 2018, he started working for the Lake County Sheriff's Department High Crimes Unit, which operates in certain areas of Lake County known for violent crimes, narcotics sales, and gang activity. Detective Randle was patrolling an area of Gary, Indiana, known as the "Bronx" when he conducted a traffic stop on the car Beasley was driving.

After approaching Beasley's vehicle, Detective Randle testified that he stood directly behind the front driver's side door and asked the driver, Beasley, to roll down the car's window. Beasley used his left hand to roll down the car window. After rolling down the window, Beasley placed his left hand on his pants and held it there tight against his body. Beasley's left hand would remain in this location, at times unnaturally so, from this time until Beasley was told to put his hands on his head after being ordered out of the vehicle.

The exact placement of Beasley's left hand was inquired into at great length at the hearing. On direct examination, Detective Randle described the placement of Beasley's left hand as being on his waist area, pants area, and his pocket area. On cross-examination, Detective Randle first

3

described Beasley's left hand as being on his waist area and specifically noted that it was between his pocket and his waist area. Defense counsel then examined Detective Randle as to statements in the probable cause affidavit and incident report, in which Detective Randle described the placement of Beasley's hand as "on his left front pants pocket." In these documents, Beasley's waistband is not mentioned. On further cross-examination, Detective Randle testified that his earlier statements contained in the probable cause affidavit, which defense counsel characterized as claiming Beasley's left hand was on his pocket, were true. Defense counsel's cross-examination led Detective Randle to say that his statements at the hearing, which defense counsel described as being that Beasley's hand was in his waistband, were not true. However, defense counsel's cross-examination leading to this "admission" that one of the statements was not true was based on the false premise that Detective Randle's hearing testimony was inconsistent with his previous report and affidavit. Detective Randle was asked which of the "pockets" statement and the "waistband" statement was true and which one was false. He was not asked if both were true.

Nothing in Detective Randle's testimony was inconsistent with his earlier report or probable cause statement. Defense counsel conducted a very effective cross-examination, but even he later agreed that Detective Randle had said that Beasley's hand was *at* his waistband and not *in* his waistband. This is significant because, arguably, a hand cannot be both *in* a waistband *and* over a front pocket. Given the proximity of many front pockets to the end of a waistband, however, a hand can be on both a front pocket and the waistband. The statements Detective Randle made at the hearing—that Beasley's hand was on the pants, pocket, and waist areas—are all consistent, as a hand can be positioned in a way to cover all of these areas. Detective Randle demonstrated such a position, which he testified was where Beasley positioned his hand.

On redirect examination, Detective Randle affirmed that he was testifying truthfully at the hearing. Detective Randle clarified that, while sitting, Beasley's left hand looked like it was on the pocket area and that, while standing, the hand transitioned to the waist area. Detective Randle also testified that, when seated, pockets generally connect to the waistband area. Detective Randle demonstrated where Beasley's hand was placed while seated. The thumb of the hand was at the waistband, and the rest of the hand extended to the pocket.

Detective Randle testified that he asked Beasley for his license, and Beasley reached over with his right hand to the passenger seat, fumbled through paperwork and miscellaneous items with that hand, and retrieved his license. Beasley did not transfer the paperwork to his lap, or use both hands to look through it. Using only his right hand, Beasley passed the license to Detective Randle—who was still standing behind the front driver's side door. When Detective Randle requested the vehicle registration, Beasley leaned his upper body over, without turning his body, to go through the glove compartment with his right hand. The one-handed shuffling through papers, keeping the left hand stationary while the rest of the body was freely moving, and reaching across the body and over the far shoulder with the right hand instead of using the closer left hand were all noted and led Detective Randle to become suspicious that Beasley was concealing a weapon of some sort. Beasley's right hand was also slightly shaking as he passed his license to Detective Randle.

Detective Randle suspected that Beasley was concealing a weapon with his left hand, and he asked Beasley to exit the vehicle. Beasley reached across his body with his right hand to open the driver's side door instead of using his left hand. Upon exiting the vehicle, Beasley immediately turned to face in the direction of the vehicle and away from Detective Randle.

5

Beasley's left hand remained in the same position from the time directly after Beasley rolled down the window to after he exited the car and Detective Randle asked Beasley to place his hands on his head. Even then, Beasley was hesitant to move his left hand, which Detective Randle had to guide up. Beasley did not hesitate in raising his right hand.

The Court finds Detective Randle credible, not only because of his demeanor and the consistency of his story, but also due to the fact that he avoided embellishing his testimony in a manner that would help defeat Beasley's motion to dismiss. Detective Randle was under oath and expected to tell the truth, but it is worth noting that this his demeanor and willingness to quickly concede facts that did not support the government's position added to his credibility. He readily conceded that various factors often giving rise to probable cause did not exist. He did not observe any furtive movements. Although the search later turned up narcotics, Detective Randle did not see any in plain view prior to the search. He did not see Beasley try to hide or conceal anything or attempt to throw anything out of a window. Detective Randle acknowledged that, prior to the pat down, he did not observe a bulge where the gun was later found.

Detective Randle testified he was concerned that Beasley had a weapon on him due to Beasley's left hand, which remained in the same position from the time right after Beasley rolled down the window to after he exited the car and Detective Randle asked Beasley to place his hands on his head. Detective Randle testified that he found Beasley's behavior to be abnormal. In Detective Randle's experience, drivers do not normally reach across their bodies and over their shoulders to pass identification to an officer. Detective Randle found odd Beasley's behavior of keeping his left hand positioned as it was during the retrieval of his license and the search for his registration. Further, Detective Randle testified that, when a person exits a vehicle in the manner Beasley did, the person is often concealing something. Detective Randle also noted that the manner

6

in which Beasley hesitated in raising his left hand was suspicious. Detective Randle observed all of this while conducting a valid traffic stop in a high violent crime area late at night and after he had made an arrest in a separate firearms case that same evening.

## LEGAL STANDARD

Beasley asks the Court to suppress evidence seized, statements made, and observations made during or as a result of the traffic stop. He does not assert that the traffic stop itself was invalid. Instead, he argues that the order for Beasley to exit the vehicle and the subsequent pat down search violated his constitutionally protected rights and call for the exclusion of evidence.

The Fourth Amendment to the Constitution of the United States protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

The Supreme Court has determined that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977); *see also Rodriguez v. United States*, 135 S.Ct. 1609, 1615 (2015) ("In *Mimms*, we reasoned that the government's 'legitimate and weighty' interest in officer safety outweighs the '*de minimis*' additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle.").

However, a traffic stop does not automatically permit a subsequent pat down search, and "[t]here must be a separate analysis of whether the standard for pat-frisks has been met." *United States v. McKoy*, 428 F.3d 38, 39 (1st Cir. 2005) *quoted in United States v. Williams*, 731 F.3d 678, 683 (7th Cir. 2013). A pat down for weapons must be "supported by a reasonable belief that [the person searched is] armed and presently dangerous." *Ybarra v. Illinois*, 444 U.S. 85, 92–93

(1979) (citing *Adams v. Williams*, 407 U.S. 143, 146 (1972); *Terry v. Ohio*, 392 U.S. 1, 21–24 (1968)).

This "reasonable belief," also frequently articulated as a "reasonable suspicion," requires "considerably less than proof of wrongdoing by a preponderance of the evidence," *United States v. Skolow*, 490 U.S. 1, 7 (1989), and is an objective standard that "turns on the totality of the circumstances confronting the officer," *United States v. Patton*, 705 F.3d 734, 738 (7th Cir. 2013). It is the government's burden to establish reasonable suspicion by a preponderance of the evidence. *United States v. Uribe*, 709 F.3d 646, 650 (7th Cir. 2013). "Circumstances to be considered as part of the reasonable suspicion analysis include: the officer's experience and training, the stop's location, when the stop occurred, and the suspect's demeanor and behavior." *Williams*, 731 F.3d at 696 (Ripple, J., concurring in part and dissenting in part) (citations omitted). The officer is entitled to make "specific reasonable inferences . . . [drawn] from the facts in light of his experience," but an "inchoate and unparticularized suspicion or 'hunch'" is insufficient to support a reasonable suspicion. *Terry*, 392 U.S. at 27.

"The danger justifying a protective frisk arises from the combination of a forced police encounter and the presence of a weapon, not from any illegality of the weapon's possession." *United States v. Robinson*, 846 F.3d 694, 696 (4th Cir. 2017) (citing *Adams v. Williams*, 407 U.S. 143, 146 (1972); *Michigan v. Long*, 463 U.S. 1032, 1052 n.16 (1983)). For this reason, though the test is often referred to as turning on whether an individual is "armed and dangerous" a more accurate way to phrase it may be "armed and therefore dangerous." *See Mimms*, 434 U.S. at 112 ("The bulge in the jacket permitted the officer to conclude that Mimms was *armed and thus posed a serious and present danger* to the safety of the officer." (emphasis added)); *Terry*, 392 U.S. at 28 ("We think on the facts and circumstances Officer McFadden detailed before the trial judge a

8

reasonably prudent man would have been warranted in believing petitioner was *armed and thus presented a threat to the officer's safety* while he was investigating his suspicious behavior." (emphasis added)); *accord Robinson*, 846 F.3d at 700.

Perhaps the right to "possess and display" firearms could factor into this analysis in some reasonable suspicion determinations. *United States v. Watson*, 900 F.3d 892, 898 (7th Cir. 2018) (Hamilton J., concurring) ("For the reasons explained in my separate opinion in *Williams*, however, I believe that after recent expansions of legal rights to possess and display firearms, the stop in that case was not justified under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and the myriad cases applying it." (internal citations omitted)). However, even if the Seventh Circuit Court of Appeals should adopt this view, that would not change the outcome of Beasley's motion to suppress. Beasley is not arguing that he was exercising his right to possess and display firearms and that this exercise of his right is what the government relies on in arguing that there was reasonable suspicion. Speeding, not a firearms violation, was the basis for the vehicle stop. The uncontradicted evidence is that there was no weapon in plain view and Detective Randle specifically mentioned he was afraid alerting Beasley to the fact Detective Randle thought Beasley had a firearm would threaten officer safety.

## ANALYSIS

Beasley's first argument, that Detective Randle's decision to have him step out of the vehicle he was driving calls for suppression, runs contrary to case law. *See Rodriguez*, 135 S.Ct. at 1615; *Mimms*, 434 U.S. at 111 n.6. Additionally, there is no indication that removing Beasley from his vehicle exceeded the scope of, or unnecessarily prolonged, the initial traffic stop in a manner that would require further analysis before finding that suppression is unwarranted on this

theory. *See, e.g.*, *Rodriguez*, 135 S.Ct. at 1612; *United States v. Lewis*, 920 F.3d 483, 491 (7th Cir. 2019).

However, whether the government met its burden in establishing that Detective Randle had a reasonable suspicion that Beasley was armed requires a more detailed review of Beasley's actions prior to the pat down. In conducting such a review, this Court will also review factors that other courts have turned to in the past to consider whether law enforcement was operating under objectively reasonable suspicions prior to conducting a pat down. The Court does not look only at Beasley's hand placement and movement but instead looks to the totality of the circumstances as testified to by Detective Randle.

Hand movements can have a bearing on whether an officer develops reasonable suspicion, but in instances such as this where the movements are more accurately characterized as keeping hands in a single position, they are rarely the only consideration. The government cites to *United States v. Tinnie* and correctly notes that the "suspicious" behavior of hand movements over a pocket only "helped" to support probable cause in that case. (Gov't Resp. 7, ECF No. 20). *Tinnie* involved a defendant feeling the outside of his pockets instead of placing his hands in his pockets before saying that he didn't have identification on him, lying about his age, and denying having narcotics, yet remaining silent concerning whether he had a firearm. *United States v. Tinnie*, 629 F.3d 749, 752 (7th Cir. 2011). In contrast, while *United States v. Williams* involved additional factors, such as the stop at issue occurring in a high crime area, in response to a 911 call, and with Williams avoiding eye contact with the police, the Seventh Circuit Court of Appeals took a skeptical view of placing too much emphasis on the placement of Williams' hands in his pockets, noting, "the simple fact that one's hands are in one's pockets is of a similar nature to one's avoiding

eye contact. In other words, it is of little value." *Williams*, 731 F.3d at 689. Yet, the *Williams* court rejected the idea that awkward hand placement could never support reasonable suspicion, saying:

> We do not believe that pocketed hands are entirely irrelevant nor do we create a categorical rule finding them so. Indeed, if one's hands are pocketed in an awkward way or if it seems that the individual is holding a larger-than-average item in his or her pocket, those facts could lead a reasonable officer to believe that a gun was contained therein, and support a frisk.

*Id.* at 689. In *United States v. Oglesby*, a case with similar facts to the instant matter, the repeated moving of a hand toward a pants pocket that was angled away from the officers, coupled with the officer's testimony that the defendant's angled stance and movement toward the pocket were, in his training, indicative of a possible weapon, was a factor in favor of finding a reasonable suspicion. 597 F.3d 891, 895 (7th Cir. 2010).

In looking at the "totality of the circumstances," it is useful to proceed chronologically and consider each factor the government puts forth to meet its burden of establishing an objectively reasonable suspicion. This traffic stop occurred late at night, in a high crime area, and after Detective Randle had made a separate arrest the same evening for a firearms offense.[1] Of course, these conditions merely set the stage for what Detective Randle later encountered. They do not, in and of themselves, provide reasonable suspicion. "While context is certainly important to the totality-of-the-circumstances analysis, neither the lateness of the hour nor the nature of the locale automatically transforms non-threatening acts into indicators of danger." *Tinnie*, 629 F.3d at 758 (Hamilton, J., dissenting). Citizens are entitled to an individualized inquiry into whether a pat down is appropriate, even if they live in a high crime area where "the possibility that any given

---

[1] Beasley's counsel did an effective job of establishing that Detective Randle lacked any hard data to define the "Bronx" in Gary, Indiana as a high crime area. As defense counsel pointed out, "high crime" is a relative term. If the Court were placing greater emphasis on this factor, such argument might carry greater weight. However, Detective Randle testified credibly that he was assigned to this area because it was designated as a high crime area, and he described the types of crimes he has routinely seen since starting his present assignment with the High Crimes Unit.

11

individual is armed is significant." *Williams*, 731 F.3d at 687 (quoting *Maryland v. Buie,* 494 U.S. 325, 342 n.2 (1990)). The government must show significantly more than this contextual information in order to meet its burden. However, these factors, together with Detective Randle making an arrest for a firearms crime earlier that shift, provide the context for the subsequent encounter between Detective Randle and Beasley.

As Detective Randle was conducting the traffic stop, Beasley rolled down his window with his left hand. When Detective Randle asked Beasley for his driver's license, Beasley reached over his body with his right hand and gave it to Detective Randle. This condensed version of the facts, which is close to what was contained in the probable cause affidavit for Beasley's arrest on state charges and resembles the facts in *Williams*, likely fails to provide reasonable suspicion. Yet, these are far from the only facts the government relies upon. Beasley did not simply leave his left hand on his pocket. Instead, his hand unnaturally stayed in that position as the rest of his body leaned over while he attempted to retrieve his vehicle registration from the glove box. Instead of sifting through papers with both hands, as would be natural, Beasley used only his right hand to do so. Beasley used his right hand to reach over his body to pass his license to Detective Randle, even though his left hand was closer to where Detective Randle was standing. When Beasley was ordered out of his car, he again used his right hand, reaching across his body, to open the door. Upon exiting the vehicle, instead of standing face to face with Detective Randle, Beasley immediately turned away. Through all of this time, he never removed his left hand from his waistband and pocket area. When Detective Randle ordered Beasley to place his hands on his head, Beasley immediately complied with his right hand, yet was still hesitant to move his left hand, which Detective Randle eventually directed to the back of Beasley's head.[2]

---

[2] Even if one considers the pat down to begin when Detective Randle orders Beasley's hands to his head, Detective Randle had reasonable suspicion prior to any orders that Beasley place his hands on his head.

Beasley's counsel emphasized the fact that there is no case law finding reasonable suspicion based on a defendant using their right hand versus their left. The Court has no reason to doubt this narrow statement. However, this statement is also not dispositive of the question before the Court. The Court must consider the totality of the circumstances, which involves far more than the choice to provide a license to an arresting officer with a right hand versus a left hand. As Beasley's counsel stated, this Court must determine whether Detective Randle was merely working on a hunch or had reasonable suspicion that Beasley was armed.

The totality of the circumstances reveals a number of Beasley's actions that gave rise to reasonable suspicion. His unnatural actions may have *started* with the placement of his left hand on his waist and pocket area, yet such actions became more suspicious when Beasley sifted through papers with only his right hand. Again, perhaps there are innocent explanations, but as he was leaning over to the glove box and the rest of his body moved, Beasley's left hand did not move naturally with the rest of his body. Instead, it stayed in the same place. And, though reaching across one's body to hand over a driver's license is innocent enough by itself, this was another action that was consistent with Detective Randle's already growing suspicions that Beasley's left hand was holding a weapon in place. On top of this, Beasley again reached across his body to open the car door and immediately turned away from Detective Randle as he was ordered out of his car. Perhaps an objectively reasonable standard would question a conclusion based on only one or two of these factors, but the totality of the circumstances shows that there was a reasonable suspicion that Beasley was armed and dangerous. Therefore, the pat down did not violate Beasley's Fourth Amendment rights.

## CONCLUSION

Based on the foregoing, the Court **RECOMMENDS** that Judge Moody deny the Motion to Suppress [DE 15].

This Report and Recommendation is submitted pursuant to 28 U.S.C. § 636(b)(1)(C). Pursuant to 28 U.S.C. § 636(b)(1), the parties shall have fourteen days after being served with a copy of this Recommendation to file written objections thereto with the Clerk of Court. The failure to file a timely objection will result in waiver of the right to challenge this Report and Recommendation before either the District Court or the Court of Appeals. Fed. R. Crim. P. 59(b)(2); *United States v. Hall*, 462 F.3d 684, 689 (7th Cir. 2006); *Willis v. Caterpillar, Inc.*, 199 F.3d 902, 904 (7th Cir. 1999); *Hunger v. Leininger*, 15 F.3d 664, 668 (7th Cir. 1994); *The Provident Bank v. Manor Steel Corp.*, 882 F.2d 258, 260-261 (7th Cir. 1989); *Lebovitz v. Miller*, 856 F.2d 902, 905 n.2 (7th Cir. 1988).

So ORDERED this 11th day of June, 2019.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT